UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                                     :

METITO (OVERSEAS) LTD.,           :
                                       :

                    Plaintiff,     :

                                       :       05 Civ. 9478 (GEL)

    -v.-                       :

                                       :       **OPINION AND ORDER**

GENERAL ELECTRIC COMPANY and JOHN  :
DOES 1-20,                  :
                    Defendants.   :
                                       :
-------------------------------------------------------------x

Vano Haroutunian, Ballon Stoll Bader & Nader, P.C.,
New York, NY, for plaintiff.

Jyotin Hamid, Jacob Stahl, Debevoise & Plimpton LLP,
New York, NY, for defendant General Electric Company.


GERARD E. LYNCH, District Judge:

      Plaintiff Metito (Overseas) Ltd. ("Metito") commenced this action alleging broad ranging

acts of unfair competition by defendant General Electric Company ("GE")[1] stemming from the

purported solicitation of Metito employees throughout the Middle East.  Specifically, Metito

claims that GE (1) tortiously interfered with Metito's contracts through the hiring of Metito

employees; (2) tortiously interfered with Metito's prospective business relations; (3)

misappropriated Metito trade secrets through former Metito employees; and (4) engaged in

unfair competition through predatory recruiting of Metito employees.  As a result, Metito seeks

to permanently enjoin GE from contacting any "contractually-barred" Metito employees or

attempting to acquire Metito's trade secrets.  Metito additionally alleges that GE committed

---

[1]  Except as otherwise indicated, the term "GE" will be used throughout this Opinion to
refer to collectively to the defendant General Electric Company and its subsidiaries.

trade defamation and seeks $50 million in damages therein.

Metito moves for partial summary judgment on liability with respect to all claims except defamation.  GE cross-moves for summary judgment on all counts.  For the following reasons, Metito's motion is denied and summary judgment is granted to GE on all claims.

## BACKGROUND

Upon completion of discovery, and in response to GE's motion for summary judgment, what began as a case involving allegations concerning a plethora of improper activity involving a score of improperly hired employees and the attendant misuse of their knowledge to unjustly gain a competitive advantage has, in almost every essential regard, been reduced to a case concerning the career of a single individual – Preshant Sonmale.[2]

Before describing Sonmale's career, however, it is necessary to briefly describe GE's corporate structure.  Defendant General Electric Company is incorporated in New York and headquartered in Connecticut.  (Hamid Decl. Ex. 4, Defendant's Response to Interrogatory No. 1a.)  The General Electric Company conducts its water industry business through GE Infrastructure, an unincorporated subdivision of the General Electric Company, which in turn contains an unincorporated division called GE Infrastructure Water & Process Technologies ("GE Water").  (P 56.1 Stmt. ¶ 4; D 56.1 Stmt. ¶ 4.)

General Electric International, Inc. ("GEII") is a wholly-owned subsidiary of the General Electric Company.  (D 56.1 Stmt. ¶ 151.)  GEII is incorporated in Delaware and has its principal offices in Connecticut.  (Id.)  GEII provides various services, including employment services, to

---

[2]  Except as otherwise noted, this Opinion describes the facts in the light most favorable to Metito, in view of the admissible evidence presented.

a number of subsidiaries of the General Electric Company, including GE Betz S.r.l ("GE Betz").

(Id.)  GE Betz is a wholly-owned indirect subsidiary of the General Electric Company's GE

Water division.  (D 56.1 Stmt. ¶ 152.)  GE Betz is an Italian corporation with its principal offices

in Milan.  (Id.)  GE Europe is a subsidiary of the General Electric Company based in Brussels.

(D 56.1 Stmt. ¶ 153.)

## I.     Preshant Sonmale

Sonmale began working for Metito in July 2001, pursuant to an employment contract

dated April 23, 2001.  (Pl. 56.1 Stmt. ¶ 8; D 56.1 Stmt. ¶¶ 1, 3.)  Sonmale's contract with Metito

contains both a confidentiality agreement and a non-compete provision:

> In the course of your employment with the company, you will have
> access to various information that is regarded by the company as
> highly confidential.  In this regard you are expected not to divulge
> such information to any third party outside the company, or to
> other company employees, during or after your employment in any
> form or manner.
>
> Such information shall remain the sole property of the company
> and shall not be used except to the extent necessary to promote the
> company business[.]
>
> You shall also abide by the non-competition clauses and in
> particular, you shall strictly abide by article 127 of the United Arab
> Emirates Labor Law[.]  You shall not engage in any competing
> business to that of the company and you shall not join a competitor
> for a period of at least two years from the date you leave the
> company for whatever reason.

(Hamid Decl.  Ex. 33, ¶ 8(a).)

Throughout his employment with Metito, Sonmale worked as a Senior Proposals

Engineer in the United Arab Emirates ("UAE").  (P 56.1 Stmt. ¶ 7; D 56.1 Stmt. ¶ 3.)  In that

capacity, Sonmale prepared proposals and bids for prospective projects concerning the

construction of water desalination and waste water treatment plants, machinery and equipment (D 56.1 Stmt. ¶ 3), and in aid of those duties Sonmale interacted with Metito's customers and had access to, among other things, a list of Metito's vendors and information on costs and prices (Sonmale Tr. 20:5-15; 25:23-26:5; 28:4-10).

By 2003, Sonmale had become unhappy working at Metito and began searching for a new job in engineering and environmental fields.  (Sonmale Decl. ¶ 8.)  Throughout 2003 and 2004, Sonmale submitted at least six applications for jobs in engineering and environmental to firms and employment search agencies.   (Id.; Hamid Decl. Ex. 34.)

In January 2005, Sonmale learned of a position at GE and submitted an application through GE's online Career Opportunity System.  (Sonmale Decl. ¶ 9; Verdonck Decl. ¶ 6.) Sonmale testified that he applied to GE unsolicited and that at the time he applied he did not know anyone at GE and had not spoken to anyone at GE.  (Sonmale Decl. ¶ 9; Sonmale Tr. 33:19-34:2; 97:9-11.)  Thereafter, Sonmale had an initial telephonic interview with Katya Verdonck, who at the time was employed as the Executive Recruiter for GE subsidiary GE Europe, with responsibility for job applicants throughout Europe, the Middle East and Africa. (D 56.1 Stmt. ¶¶ 10, 154, 155.)  Sonmale had a second-round, in-person interview with Jean-Michel Freal-Saison, who appears to be the Hiring Manager for either GE Infrastructure or GE Water.   (See D 56.1 Stmt. ¶ 10; P 56.1 Stmt. ¶ 37; D Resp. Stmt. ¶ 37; Verdonck Tr. 43:11-17.)

On March 31, 2005, Sonmale was preliminarily offered a position with GE subsidiary GEII, as a "Regional Waster Water Technical Support Leader, based in Dubai, UAE," contingent upon a successful background check and, since Sonmale is not a UAE citizen, procurement of a visa to work in the UAE.  (D 56.1 Stmt. ¶¶ 10, 13; Hamid Decl. Ex. 36.)  On May 5, Sonmale

provided Metito with thirty-days' notice of his resignation due to "personal reasons."  (D 56.1 Stmt. ¶ 14.)  Metito asked Sonmale to stay on an additional twenty days to continue working on Metito's bid for the Dubai Festival City Project – of which Sonmale was the lead proposal engineer – and as a result, Sonmale continued to work for Metito until June 30, 2005.  (D 56.1 Stmt. ¶ 15; P Resp. Stmt. ¶¶ 5, 15; Sonmale Decl. ¶ 13.)

The parties dispute when Sonmale informed Metito that he intended to work at GE, but it is clear that Metito was aware of this fact prior to Sonmale's resignation.  On June 26, 2005, Metito's in-house counsel, Mohammed Abusinn, presented Sonmale with a letter entitled "Legal Notification."  The letter stated, in part:  "I understand that you were approached directly by General Electric Company ("GE" or "Potential Competitor") to join their operations in the UAE. I also understand that you have accepted GE's offer of employment and consequently, decided to resign your current job with the Company."  (Hamid Decl. Ex. 38.)  The letter also reiterated Sonmale's obligation to refrain from disclosing confidential information in his new job at GE:

> [Y]ou will appreciate that upon you resigning your position with the Company to pursue other related career, it is likely that you would be confronted with situations or entrusted with new role and responsibilities where your knowledge of such Confidential Information may be tempting or attractive to introduce, use, implement or share with third parties and/or the Potential Competitor.
>
> Whilst considering the above, I would like to remind you that despite your resignation, your contractual obligation not to divulge, use or share the Confidential Information with any third party including the Potential Competitor shall survive the termination of your contract of employment with the Company.

(Id.)

5

Sonmale signed the document, acknowledging that he "read, understood and agree[d]" to its contents.  (Id.; D 56.1 Stmt. ¶ 17.)  Sonmale has testified that he signed the document even though he disagreed with the statement that GE approached him because it was what Metito – which was holding his passport and nearly 30,000 dirhams of his money (approximately $8000) – wanted to hear.  (Sonmale Tr. 112:6-113:10.)

When Sonmale resigned from Metito on June 30, 2005, his position was one level above entry-level and no employees reported to him.  (D 56.1 Stmt. ¶¶ 5, 20.)  Sonmale's annual salary of approximately $33,350 – slightly above the average annual income in the UAE of $29,000 – made him the fourth highest paid senior proposal engineer of the fourteen within his department. (D 56.1 Stmt. ¶ 4; P Resp. Stmt. ¶ 4; Halabi Decl. ¶ 13.)  Metito asserts that Sonmale had worked on numerous "high-level" projects during his tenure at Metito, though neither explains what made the projects "high-level" nor what role Sonmale played.   (Halabi Decl. ¶ 14.)

Upon his resignation, Sonmale – a citizen of India who had been in the UAE on a Metito-sponsored work visa – returned to India where he stayed until September, when he commenced employment with GE.  (P Resp. Stmt. ¶ 20; D 56.1 Stmt. ¶ 21.)  Because Metito did not consent to transfer Sonmale's employment to GE, UAE law rendered Sonmale ineligible to obtain a new work visa or residency permit in that country for a period of six months.  (P Resp. Stmt. ¶ 22.) Sonmale sought and suggested to GE ways to circumvent this six-month ban; however, GE insisted that it would "strictly follow the local regulation." (Hamdi Decl. Ex. 39.)  In an email dated July 3, 2005, Sonmale expressed a desire to "join any offices of GE at the earliest." (Hamdi Decl. Ex. 39 at GE0000352.)

Through email correspondence in early August 2005, in response to an inquiry by GE, Sonmale informed GE that his contract with Metito contained a two-year non-compete provision separate and apart from the six-month ban on working in the UAE.  (Hamid Decl. Ex. 40.) Metito and GE agree that this is the first time anyone at GE learned of this contractual restriction.  (Hr'g Tr. 5:11-15; D 56.1 Stmt. ¶ 18.)

On September 14, 2005, Sonmale began working for GE subsidiary GE Betz, in Bahrain. (D 56.1 Stmt. ¶¶ 24-25; P 56.1 Stmt. ¶ 11.)  In March 2006, at the end of the six-month ban, Sonmale obtained a visa and began working in Dubai for GEII, another GE subsidiary, as a "Technical Manager," but continues to provide services to GE Betz.  (D 56.1 Stmt. ¶¶ 27, 153; P 56.1 Stmt. ¶ 13.)  The parties agree that Sonmale's duties and responsibilities at GEII are identical to those he had at GE Betz (D 56.1 Stmt. ¶ 28; P Resp. Stmt. ¶ 28), although they dispute the nature of those duties and responsibilities.

## II.    Other Metito Employees

In addition to Sonmale, Metito points to two other former Metito employees who subsequently worked at GE: Karim Nasr[3] and Khaled Salah Eldin Ibrahim ("Salah").  (D 56.1 Stmt. ¶¶ 33-35, 37, 40, 45.)  Neither of these individuals, however, had non-compete agreements with Metito.  (D 56.1 Stmt. ¶¶ 39, 47; P Resp. Stmt. ¶¶ 39, 47.)  As with Sonmale, GE Europe's Verdonck was involved in the hiring of both Nasr and Salah, and both men are employed by GEII and provide services to GE Betz.  (D 56.1 Stmt. ¶¶ 153, 154.)

---

[3] Nasr did not join GE directly from Metito.  Nasr worked for a former affiliate of plaintiff, Metito Arabia Industries, Ltd., and had intervening employment before joining GE.  (D 56.1 Stmt. ¶¶ 33-37.)

Metito employees were identified in several internal GE emails as potential candidates for GE employment, two by name.  (P 56.1 Stmt. ¶¶ 36-38.)  Neither of the individuals singled out had non-compete agreements with Metito and neither was hired by GE.  (D 56.1 Stmt. ¶¶ 90, 92, 95, 96; P Resp. Stmt. ¶¶ 90, 92, 95, 96.)  At least four other Metito employees have at some point applied to work for GE without success.  (D 56.1 Stmt. ¶¶ 66-67, 79-80, 97, 99.)  Only one of those individuals had a non-compete agreement with Metito (see id.); that individual made eleven unsolicited and unsuccessful applications to work at GE between 2003 and 2005 (D 56.1 Stmt. ¶¶ 77-82; P 56.1 Stmt. ¶¶ 77-82).  Several GE employees discussed the possibility of employment with five Metito employees who ultimately never pursued the opportunity.  (D 56.1 Stmt. ¶¶ 52-56, 57-62, 71-76, 84-87, 89-92.)  Only one of those five – Walid Oraby, the general manager of Metito's Qatar operations – had a non-compete agreement with Metito, though Metito points to no evidence that GE was aware of this agreement.  (See id.; P Resp. Stmt. ¶¶ 85-87; Oraby Tr. 10:8-14.)

At an industry trade show in Dubai in April 2005 Oraby engaged in a short conversation with Nasr and Salah (coincidentally, the two former Metito employees other than Sonmale now working for GE).  (Oraby Tr. 12:25-13:15; 17:7-22.)  According to Oraby, during that conversation Nasr stated that numerous Metito employees were applying to work at GE and asked whether Oraby would be interested in working for GE in Qatar.  (Id. 19:4-20:5; Oraby Decl. ¶ 4.)  Oraby further testified that Nasr stated that Metito was a "sinking ship" that would at some point "sell out" to a bigger company, leaving Oraby "with a big mess."  (Oraby Tr. 20:14-17; Oraby Decl. ¶ 4.)  Oraby considered this to be an attack on Metito's long-term viability in the region, a proposition which he rejected as false.  (Id. 20:23-21:10; 21:25-22:2.)

**III.     Metito's Business Relations**

Shortly after Sonmale resigned, Metito failed to obtain several business opportunities which it sought.  In addition, Metito contends that following Sonmale's arrival at GE, GE contacted a long-time vendor of Metito, which was previously unknown to GE.  Metito's managing director Fady Juez testified as its Rule 30(b)(6) witness on each of the following business relations with which Metito contends GE tortiously interfered:

 A.     Dubai Festival City Project

The Dubai Festival City Project involved a multi-faceted real estate development.  (Juez Tr. 20:17-18.)  Sonmale was Metito's lead proposal engineer in connection with its bid for the wastewater recycling aspect of this project.  (P 56.1 Stmt. ¶ 5; Juez Tr. 49:13-16.)  Over the course of several months, Metito proposed a number of models to the potential client.  (Juez Tr. 52:5-11.)  Shortly before Sonmale's resignation at the end of June 2005, Metito submitted a final proposal to the client and believed that it was close to securing the project.  (Id. 52:20-25.)  Metito contends that up to this point GE was unaware of this project.  (Id. 57:23-25.)  Metito believes that following Sonmale's departure, GE representatives met with the client and criticized technical aspects of Metito's proposal.  (D 56.1 Stmt. ¶ 104.)  GE does not dispute this. The client subsequently informed Metito employee Mahmouad Kabeel that it was not awarding the project to Metito, and Kabeel in turn informed Juez that GE's criticisms caused Metito to lose the project.  (Juez Tr. 55:6-56:23.)[4]  During his deposition Juez could not provide any details concerning who at GE spoke with the client, who at the client informed Metito of GE's

---

[4]  This occurred approximately a month and a half after Sonmale left Metito, but before Sonmale joined GE in September.  (Juez Tr. 55:5-8.)

criticisms, or whether Kabeel implicated Sonmale in GE's actions.  (Id. 56:24-57:17.)  Juez did

not indicate that any of the alleged criticisms were inaccurate.  (D 56.1 Stmt. ¶ 105.)  Juez did

not know whether GE ever bid on the project and testified that the project ultimately never

occurred.  (Juez Tr. 65:4-66:2.)  Sonmale testified that he did no work on the Dubai City Festival

Project since joining GE.  (Sonmale Tr. 104:7-9.)

      B.     Al Hamra Power Project

     The Al Hamra Power Project involved the construction of a desalination plant in the

UAE.  (Juez Tr. 23:23-24:5.)  Metito submitted a bid for this project when it was first tendered.

(Id. 60:20-22.)  That tender was subsequently cancelled.  Juez testified that Kabeel told him that

GE convinced the client to re-tender the project.  (Id. 61:25-62:9.)  Juez could not provide any

details of how the client decided to re-tender the project, how GE influenced that decision, who

at GE was involved, or how Kabeel came to possess this information.  (Id. 63:9-64:2.)  The

project was never re-tendered and was ultimately cancelled.  (Id. 59-21:24; 64:3-14; 65:22-

66:10.)  GE never bid on the Al Hamra Power Project, nor did Sonmale ever do any work in

connection with this project. (D 56.1 Stmt. ¶¶ 110, 113; P Resp. Stmt. ¶¶ 110, 113.)

      C.     Touggourt Project

     The Touggourt Project involved a bid to construct a water desalination plant in Algeria.

(Juez Tr. 68:5-8.)  Metito, together with an Algerian partner, submitted a bid on the project when

it was first tendered around November 2005.  (Id. 70:7-12; 71:22-73:6.)  According to Juez, the

client informed Metito that it had submitted the lowest bid.  (Id. 26:2-3.)  The client

subsequently cancelled the first tender, in which GE did not participate, and called for a re-

tender.  (Id. 73:7-10; 75:20-76:8.)  Juez testified that another Metito employee, Karim Madwar,

told him that GE pressured the client to take this action so that it could bid on the project.  (Id. 74:19-24.)  Juez did not know any details about how GE allegedly pressured the client to re-tender the project, who at GE was involved, or how Madwar came to possess this information. (Id. 75:3-19.)  Metito re-bid on the project, and Juez believed Metito to be still in contention for this project, which had yet to be awarded (as of the date of Juez's deposition).  (Id. 77:14-17; 78:18-79:1.)  Juez did not know whether GE is still participating in the bid for this project.  (Id. 79:14-16.)  GE bid on the project in the second tender, but did not re-bid when the client tendered the project for a third time.  (Hamida Tr. 96:19-98:20.)  Sonmale was not involved in GE's bid for the Touggourt Project.  (Id. 85:14-19; Sonmale Tr. 104:10-12.)

        D.      Super Engineering Industry LLC

        Super Engineering Industry LLC ("SEI") is a vendor that Metito frequently contracted to do fabrication work for over a decade. (P. 56.1 Resp. Stmt. ¶ 121; Juez Tr. 19:6-10.)  Metito asserts that over the years it "educated, trained and cultivated" SEI and that SEI was not known to anybody else in the water industry.  (P. 56.1 Resp. Stmt. ¶ 121; Juez Tr. 43:20-25.)  Sonmale was aware of SEI from his work at Metito.  (Sonmale Tr. 104:16-23.)  According to Juez, shortly after Sonmale went to work for GE, another Metito employee, Mohamad Shabani, told Juez that GE had attempted to do business with SEI.  (Juez Tr. 45:19-46:3.)  Juez did not know any details about the interaction between GE and SEI, who at GE approached SEI, the result of the interaction, or the source of Shabani's information.  (Id. 45:19-47:11.)  Shabani did not tell Juez that Sonmale was in any way involved (id. 46:8-11), and Sonmale testified that he has done no work in connection with SEI while working at GE (Sonmale Tr. 104:16-23.)

**IV.     Procedural History**

On November 9, 2005, Metito initiated this action against defendants the General Electric

Company, GEII and John Does 1-20, and immediately sought a preliminary injunction.

Defendants moved to dismiss on the basis of forum non conveniens arguing that the UAE would

be a more appropriate forum.  On December 12, 2005, Metito's application for a preliminary

injunction was denied.  After limited discovery on jurisdictional issues, Metito filed an amended

complaint, naming only the General Electric Company and John Does 1-20 as defendants.  GE

again moved to dismiss on the basis of forum non conveniens in favor of the UAE.  That motion

was denied on November 7, 2006.  See Metito (Overseas) Ltd. v. General Electric Co., 05 Civ.

9478(GEL), 2006 WL 3230301 (S.D.N.Y. Nov. 7, 2006).  After several extensions, discovery

closed on February 29, 2008.  Subsequently, both parties moved for summary judgment.

**DISCUSSION**

**I.     Summary Judgment Standard**

Summary judgment is appropriate where the "pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine issue as to any material fact

and that the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  An issue

is genuine "if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party."  Roe v. City of Waterbury, 542 F.3d 31, 35 (2d Cir. 2008).  An issue is

material if it "might affect the outcome of the suit under the governing law."  Id.

"When the burden of proof at trial would fall on the nonmoving party, it is ordinarily

sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential

element of the nonmovant's claim."  Jaramillo v. Weyerhauser Co., 536 F.3d 140, 145 (2d Cir.

12

2008).  The burden then shifts to the nonmovant to put forth admissible evidence sufficient to create a genuine issue of material fact for trial.  Id.  A court must draw all "justifiable inferences" in the nonmovant's favor, and construe all of the facts in the light most favorable to the nonmovant.  Anderson v. Liberty Lobby, 477 U.S. 242, 255 (1986).  However, the "mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient" to withstand a motion for summary judgment.  Id. at 252.

The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments."  Amnesty Am. v. Town of West Hartford, 361 F.3d 113, 122 (2d Cir. 2004).  Accordingly, once the moving party "has made a properly supported motion, the [non-moving party] may not respond simply with general attacks upon the defendant's credibility, but rather must identify affirmative evidence from which a jury could find that the plaintiff has carried his or her burden of [proof]."  Crawford-El v. Britton, 523 U.S. 574, 600 (1998).  Similarly, the non-movant does not "show the existence of a genuine issue of fact to be tried merely by making assertions that are conclusory, or based on speculation."  Major League Baseball Properties, Inc. v. Salvino, Inc., 542 F.3d 290, 310 (2d Cir. 2008).  Finally, "[a] suggestion that admissible evidence might be found in the future is not enough to defeat a motion for summary judgment."  McMillian v. Johnson, 88 F.3d 1573, 1584 (11th Cir. 1996), quoted in Santos v. Murdock, 243 F.3d 681, 684 (2d Cir. 2001).

## II.    Tortious Interference With Contract

GE is entitled to summary judgment on Metito's claim of tortious interference with

contract.  To establish tortious interference with contract under New York law,[5] plaintiff must

prove: (1) the existence of a valid contract between the plaintiff and a third party; (2) defendant's

knowledge of that contract; (3) that defendant intentionally procured a breach of that contract;

and (4) resulting damages to the plaintiff.  White Plains Coat & Apron Co., Inc. v. Cintas Corp.,

460 F.3d 281, 285 (2d Cir. 2006).  Plaintiff must also establish proximate causation.  "An

essential element of such claim is that the breach of contract would not have occurred but for the

activities of the defendant."  Cantor Fitzgerald Assocs., L.P. v. Tradition N. Am., 749 N.Y.S.2d

249, 249 (1st Dep't 2002); accord, Wolff v. Rare Medium, Inc., 210 F. Supp. 2d 490, 498

(S.D.N.Y. 2002) ("[T]he third party's breach must have been caused by the defendant, meaning

that the breach would not have occurred but for the defendant's acts.").

Metito's claim that GE tortiously interfered with its contracts boils down to a claim

regarding GE's hiring of Preshant Sonmale.  Although Metito previously alleged interference

with numerous of its employment contracts, it now admits that Sonmale is the only former

---

[5] The parties disagree about what law governs this claim.  Metito argues that New York
law applies (P O'ppn 24-25), while GE argues for the application of UAE law (D Mem. 10 n.5).
Neither side, however, contends that application of one law instead of the other would affect the
outcome of this claim.  While GE seeks to apply UAE law, it represents that the governing
principles of New York and UAE laws are, for the purposes of this tortious interference with
contract claim, entirely consistent, and chooses to brief the issue under both laws.  (Id.)  Thus, it
is not necessary to conduct a choice-of-law analysis, because the parties are in implicit
agreement that it is proper to rely on New York law.  Accordingly, New York law will be
applied in evaluating this claim.  Cf. 3Com Corp. v. Banco do Brasil, S.A., 171 F.3d 739, 743
(2d Cir. 1999) ("Where the parties have agreed to the application of the forum law, their consent
concludes the choice of law inquiry.")  The parties further explicitly agree that New York law
applies to all other issues in this case, except for the defamation claim.  (P O'ppn 24-25; D Mem.
15 n.6, 17 n.7.)

14

Metito employee with a non-compete contract who subsequently went to work for GE.  (Hr'g Tr. 2:23-3:9; 3:20-4:5.)  There is no dispute that Sonmale had a contract with Metito under which he agreed not to join a competitor for two years after leaving Metito's employ, and that GE learned of this restriction in August 2005.  The parties dispute both whether the non-compete clause itself is valid and, assuming the clause is valid, whether Sonmale's activities at GE are in breach. (D Mem. 11-15; P Opp'n 5-16.)  However, it is not necessary to resolve these issues, because even assuming that Sonmale breached his employment contract with Metito by working for GE, Metito's tortious interference claim fails because no reasonable jury could conclude that GE *induced* Sonmale to breach this contract, as is required to satisfy an essential of this claim.

The evidence put forth by GE establishes that Sonmale was not induced to leave Metito's employ and seek employment with GE.  To the contrary, Sonmale testified that he was unhappy working at Metito and actively sought out a number of other employment opportunities in the two years before applying, unsolicited, to GE.  (Sonmale Decl. ¶ 8.)  In such a situation, it cannot be said that GE induced Sonmale to leave Metito or was the proximate cause of any breach.  See, e.g., Cantor Fitzgerald, 749 N.Y.S.2d at 249 (no tortious inducement where "the evidence submitted clearly established that the employees had become dissatisfied with their employment at plaintiff, were determined to breach their contracts and leave the employ of plaintiff, actively sought new employment prior to any involvement of defendant, and dictated the terms that they would require in order to work for defendant"); Rapp Boxx, Inc. v. MTV, Inc., 642 N.Y.S. 2d 228, 228 (1st Dep't 1996) (no intentional inducement where employee "voluntarily repudiated his contract with plaintiff" and "independently solicited and initiated discussions with [defendant]"); see also Michele Pommier Models, Inc. v. Men Women NY Model Mgmt., Inc.,

15

173 F.3d 845 (Table), 1999 WL 236895, at *1 (2d Cir. Apr. 15, 1999) (defendant not the but-for

cause of breach where  model sought out other opportunity prior to any contact with defendant).

   To rebut this evidence of lack of inducement, Metito points to the Metito-prepared

document in which Sonamle "admitted" that GE approached him and resorts to widespread

attacks on Sonmale's credibility.  (P O'ppn 3-5.)  As an initial matter, Sonmale's "admission" in

this unsworn document is hearsay inadmissible to prove that GE approached Sonmale.[6]  See Hill

v. Rayboy-Brauestein, 467 F. Supp. 2d 336, 361 (S.D.N.Y. 2006) (signed but unsworn letter

hearsay that "should not be considered as evidence in opposition to a motion for summary

judgment").  Although the letter may be admissible as impeachment to cast doubt on Somale's

testimony that he applied to GE unsolicited, "impeachment evidence is not substantive evidence

of the truth of the statements" and "such potential impeachment evidence, therefore, may not be

used to create a genuine issue of material fact for trial."  McMillian v. Johnson, 88 F.3d 1573,

1584 (11th Cir. 1996).[7]

---

   [6]  Although Sonmale now works for GE, he was employed by Metito at the time he
executed this letter, precluding his statements in the letter from being a non-hearsay admission
attributable to GE.

   [7]  Similarly, Metito's persistent assertion that Sonmale is untrustworthy and that his
testimony should be disregarded in its entirety does not create a genuine issue of material fact
sufficient to defeat GE's motion for summary judgment.  Metito offers no evidence to refute
Sonmale's sworn testimony that he was actively seeking to leave Metito's employ prior to any
interaction with GE.  Metito's attack on Sonmale's testimony is not a substitute for Metito's
obligation to affirmatively present contrary evidence.  Liberty Lobby, 477 U.S. at 256-57.  This
basic principle remains true "even when the evidence is likely to be within the possession of the
defendant as long as the plaintiff has had a full opportunity to conduct discovery," as the plaintiff
plainly has here.  Id. at 257.  Metito's desperate attempt to create a disputed issue here by
challenging this evidence "to the extent that it is not corroborated by independent proof
originating form each employer whom Sonmale allegedly contacted" (P 56.1 Opp'n Stmt. ¶ 7) is
unavailing.  Beyond being legally inadequate to create a triable issue, Metito's argument is
disingenuous given that Metito has had access to email correspondence concerning job

Moreover, even if GE had approached Sonmale, that fact alone would be insufficient to create a genuine issue as to whether GE induced him to leave Metito because there is undisputed evidence that Sonmale was already actively seeking a new job.  Thus, regardless of who approached who first in this instance, Sonmale was not inducible because Sonmale already desired to leave Metito.  See Michele Pommier, 1999 WL 236895, at *1.

Finally, even if GE had induced Sonmale throughout the first half of 2005, Metito concedes that GE had no knowledge of Sonamle's non-compete agreement until August 2005, after Sonmale had already resigned from Metito.  (Hr'g Tr. 5:11-15.)  It is plain that a defendant cannot intentionally procure a breach of a contract of which he has no knowledge: absent knowledge, defendant may intentionally induce certain actions, but he does not thereby intentionally induce a breach of contract.  A defendant's encouragement to another to take actions which, unbeknownst to the defendant, are in breach of a contract is not tortious behavior.  Such encouragement is not transformed into a tort by subsequent discovery that the suggested actions constituted a breach.  Although subsequent acts of inducement could potentially be actionable, by the time GE learned of the restrictive covenant, it is abundantly clear that any actions of GE could not induce Sonmale to leave Metito to work for GE as Sonmale had already resigned with the stated intention of working for GE.  GE's subsequent decision to allow Sonmale to begin actually working for GE as planned, even with its newfound knowledge, does not constitute the inducement necessary to sustain a claim for tortious interference with contract. "The fact that the defendant [with knowledge of the contracts] welcomed the breaching

_____

applications between Sonmale and six companies and search agencies since at least December 2, 2005.  (Hamid Decl. Ex. 34; Doc. #10-2.)

17

employees and agreed to their request for better terms of employment than those provided by plaintiff did not satisfy plaintiff's burden of establishing proximate causation." <u>Cantor Fitzgerald</u>, 749 N.Y.S.2d at 249.  Otherwise, "a restrictive covenant would become not only a contract but a servitude.  A party, although theoretically free to breach the contract by paying the damages, would be incapable of finding a substitute, as any new contractor would make itself liable merely by agreeing to serve." <u>Michelle Pommier</u>, 1999 WL 236895, at *1.

Accordingly, there is absolutely no evidence that could support a finding that GE tortiously interfered with Metito's contract with Sonmale, and GE is entitled to summary judgment on this claim.

**III.     Tortious Interference With Economic Relations**

GE is also entitled to summary judgment on Metito's claim for tortious interference with business relations.  Under New York law, to establish tortious inference with economic relations, plaintiff must prove:  "(1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair or improper means; and (4) the defendant's acts injured the relationship." <u>Catskill Dev., L.L.C. v. Park Place Entm't Corp.</u>, 547 F.3d 115, 132 (2d Cir. 2008); <u>Kirch v. Liberty Media Corp.</u>, 449 F.3d 388, 400 (2d Cir. 2006).  Plaintiff must be able to "demonstrate *both* wrongful means *and* that the wrongful acts were the *proximate cause* of the rejection of the plaintiff's proposed contractual relations." <u>State Street Bank & Trust Co. v. Inversiones Errazuriz Limitada</u>, 374 F.3d 158, 172 (2d Cir. 2004), <u>quoting</u> <u>Pacheco v. United Medical Assoc., P.C.</u>, 759 N.Y.S.2d 556, 559 (3d Dep't 2003).

18

Metito's claim of tortious interference with business relations hinges on its allegation that GE interfered in Metito's bid for three projects – Dubai Festival City, Al Hamra Power, and Tougourt – and attempted to do business with a vendor Metito frequently used – the Super Engineering Industry LLC Company ("SEI").[8]  (Hamid Decl. Ex. 8, Plaintiff's Response to Interrogatory No. 4.)  The record, however, is devoid of any admissible evidence that GE interfered in any way with any of these relations.  Rather, with respect to each of these alleged interferences, Metito's evidence is limited to the testimony of its Rule 30(b)(6) witness, Fady Juez, whose firsthand knowledge is simply that, in the case of the three projects, Metito did not procure the contracts and, in the case of the vendor, that Metito had a long-standing business relation with that vendor.  (Hr'g Tr. 19:17-21:16; 23:11-12.)  From there, Metito engages in rampant speculation that GE in some way wronged Metito, supported only by hearsay statements that someone involved with the project or vendor told someone at Metito who in turn told Juez that unknown persons from GE had made unspecified comments that somehow resulted in Metito's loss of some opportunity.  Even if Juez's statements were admissible – which they are not – Metito's wholly conclusory and speculative allegations fail to present any evidence upon which a jury could reasonably find that there was any interference, let alone any *tortious*

---

[8] In its brief in opposition to GE's summary judgment motion, Metito also belatedly adds the Jafza Utility Project to the list of business relations with which it claims GE interfered.  These allegations are outside the scope of the amended complaint and thus may not be considered.  See, e.g., Burch v. Chase Manhattan Mortg. Corp., 07-cv-0121-JOF, 2008 WL 4265180, at *13 (N.D. Ga. Sept. 15, 2008); La Mar v. Dep't of Economic Sec.Kabushiki Kaisha Hattori Seiko v. Refac Tech.  Dev. Corp., 690 F. Supp. 1339, 1342 n.2 (S.D.N.Y. 1988).  Although this complaint simply alleges broad economic interference and does not refer specifically to any particular relationship, the actions complained of with respect to the Jafza Utility Project occurred sometime in 2007 (see Juez Tr. 82:6-9) and thus post-date the operative complaint, which was filed February 15, 2006.

interference.  Metito suggests that "it is possible that Mr. Juez could recall [additional]
information at a future time."  (P Resp. Stmt. ¶¶ 107.)  That is insufficient.  See Santos, 243 F.3d
at 684.

Further, for interference to be tortious it must be undertaken, as Metito recognizes, "with
the sole purpose of harming the plaintiff" or with "dishonest, unfair, or improper means."  (P
O'ppn 17, quoting Purgess v. Sharrock, 33 F.3d 134, 141 (2d Cir. 1994).)  The purported
wrongful means alleged here arise from Sonmale's disclosure of Metito's confidential
information (see Hamid Decl. Ex. 8, Plaintiff's Response to Interrogatory No. 5), but Metito has
no evidence that Sonmale was in any way involved in any of these ventures while at GE and
attempts to implicate Sonmale simply by virtue of the "losses of projects and business
opportunities which Metito quickly began to suffer after [Sonmale] joined GE."  (P Mem. 6.)
This speculative and conclusory assertion is, again, insufficient.

Finally, there is absolutely no evidence that any actions by GE proximately caused any
harm to Metito.  By Metito's own admission all three of the projects were either ultimately
cancelled or have yet to be awarded, and Metito does not even allege that GE's communication
with SEI caused it to reject any subsequent work proposed by Metito.  Metito has utterly failed
to meet its burden in putting forth any evidence sufficient to sustain a claim of tortious
interference with economic relations.  Accordingly, GE is entitled to summary judgment on this
claim.

**IV.    Misappropriation of Trade Secrets**

GE is further entitled to summary judgment on Metito's claim that GE misappropriated
Metito trade secrets by exploiting confidential information possessed by Sonmale.  "To succeed

on a claim for the misappropriation of trade secrets under New York law, a party must demonstrate: (1) that it possessed a trade secret, and (2) that the defendants used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means."  North Atlantic Instruments, Inc. v. Haber, 188 F.3d 38, 43-44 (2d Cir. 1999).

The parties apparently do not dispute that Sonmale possessed Metito's trade secrets. However, as Metito concedes, there is no evidence that Sonmale ever disclosed any of these trade secrets (Hr'g Tr. 23:18-24:2) and Sonmale's sworn testimony is that he did not (Sonmale Tr. 102:18-24; 103:20-104:2).  Rather, in the absence of any evidence of actual disclosure, Metito relies on the inevitable disclosure doctrine to support its claim that GE misappropriated its trade secrets.  (Hr'g Tr. 23:18-24:2.)

The doctrine of inevitable disclosure operates, in limited circumstances, as a substitute for evidence of actual disclosure where the nature of the new employment "creates a risk that disclosure of this information is inevitable."  Int'l Bus. Mach. Corp. v. Papermaster, No. 08-cv-9078 (KMK), 2008 WL 4974508, at *7 (S.D.N.Y. Nov. 21, 2008).  "This doctrine treads an exceedingly narrow path through judicially disfavored territory.  Absent evidence of actual misappropriation by an employee, the doctrine should be applied in only the rarest of cases."  EarthWeb, Inc. v. Schlack, 71 F. Supp. 2d 299, 310 (S.D.N.Y. 1999).  The inevitable disclosure doctrine is not applicable here.

As an initial matter, this case arises in a markedly different procedural posture than is typical of inevitable disclosure cases.  Plaintiff cites no cases – nor has independent research yielded any – in which the risk of inevitable disclosure has been held sufficient to raise a triable issue of fact so as to defeat summary judgment.  Rather, the doctrine is generally considered in

the early stages of a case, prior to discovery, in the context of whether there is a sufficient risk of irreparable injury to support the issuance of a preliminary injunction.  See, e.g., PepsiCo, Inc. v. Redmond, 54 F.3d 1262 (7th Cir. 1995); Papermaster, 2008 WL 4974508; Estee Lauder Cos. Inc. v. Batra, 430 F. Supp. 2d 158 (S.D.N.Y. 2006); Tactica Int'l, Inc. v. Atlantic Horizon Int'l, Inc., 154 F. Supp. 2d 586 (S.D.N.Y. 2001); EarthWeb, 71 F. Supp. 2d 299; Lumex, Inc. v. Highsmith, 919 F. Supp. 624 (E.D.N.Y. 1996); Marietta Corp. v. Fairhust, 754 N.Y.S.2d 62 (3d Dep't 2003); Willis of New York, Inc. v. DeFelice, 750 N.Y.S.2d 39 (1st Dep't 2002); Doubleclick, Inc. v. Henderson, No.116914/97, 1997 WL 731413 (N.Y. Sup. Ct. New York Co. Nov. 7, 1997).  Extension of the doctrine to the present context, if ever appropriate, would at a minimum require a very strong showing that disclosure is truly inevitable.  Here, there is no such showing.

Cases applying the inevitable disclosure doctrine invariably involve high-level executives or persons in managerial positions.  See, e.g, PepsiCo, 54 F.3d at 1264 (general manager with "relatively high-level position"); Papermaster, 2008 WL 4974508, at *8 (vice president of department in possession of the most sensitive "crown jewels" of trade secrets); Estee Lauder, 430 F. Supp. 2d at 161 ("senior executive"); Lumex, 919 F. Supp. at 625 (product manager); Doubleclick, 1997 WL 731413, at *2 (department vice presidents).  Sonmale, by contrast, occupied a relatively low-level position at Metito, serving as one of fourteen senior proposal engineers within a particular department,  with nobody reporting to him, no managerial functions and a salary only slightly above the national average.  That Sonmale may have been involved in "high-level" projects (whatever Metito means by that) does not transform him into a high-level employee as to whom resort to the inevitable disclosure doctrine may be appropriate.  See

Tactica Int'l, 154 F. Supp. 2d at 608 (refusing to apply inevitable disclosure doctrine to non-senior level executives); Willis of New York, 750 N.Y.S.2d at 42 (rejecting application of doctrine as to defendants "not shown to be high-level employees").

Apart from Sonmale's stature at Metito, Metito's own conduct belies the notion that disclosure of trade secrets was inevitable once Sonmale moved to another employer.  For, although Sonmale was "privy to confidential information, there exists a valid and enforceable confidentiality agreement which clearly anticipated that he may change his employment during its duration after acquiring plaintiff's confidential information."  Marietta Corp., 754 N.Y.S.2d at 66 (declining to apply inevitable disclosure doctrine to plaintiff's former vice president).  Not only does Metito's initial employment contract with Sonmale contain a confidentiality agreement, but Metito reiterated this contractual obligation not to divulge confidential information – and cautioned Sonmale to resist any potential temptation to do so – even once it knew that Sonmale intended to work for GE.  (Hamid Decl. Ex. 38.)[9]  Such actions are inconsistent with the idea that disclosure of valuable trade secrets would be *inevitable*.

Metito contends that disclosure is inevitable because Sonmale's duties at GE significantly overlap with those he performed at Metito.  GE vigorously and persuasively disputes that this is so.  In light of the above considerations, however, it is not necessary to resolve this issue because, even were Sonmale's role at the two companies identical, "the mere fact that a person assumed a similar position at a competitor does not, without more, make it inevitable that he will use or disclose . . . trade secret information."  PepsiCo, 54 F.3d at 1269

---

[9] While this document is inadmissible hearsay as to GE, see supra, it is not as to Metito, which prepared the document. See Fed R. Evid. 801(d)(2).

(internal quotations and ellipses omitted).  See Marietta, 754 N.Y.S.2d at 64 (declining to apply inevitable disclosure doctrine where plaintiff's former vice president of sales and marketing subsequently took a position with a direct competitor as president of operations with responsibilities of a senior salesperson).

Accordingly, since there is no evidence of any actual disclosure, GE is entitled to summary judgment on Metito's misappropriation of trade secrets claim.

### V.    Unfair Competition

Summary judgment is also proper for GE on Metito's claims that GE's hiring process constitute unfair competition because they are designed broadly to "wrest Metito's competitive advantages away."  (P Mem. 18.)  "The essence of an unfair competition claim under New York law is that the defendant has misappropriated the labors and expenditures of another."  Berman v. Sugo LLC, 580 F. Supp. 2d 191, 208 (S.D.N.Y. 2008); accord, Abe's Rooms, Inc. v. Space Hunters, Inc., 833 N.Y.S.2d 138, 140 (2d Dep't 2007) (plaintiff claiming unfair competition must prove that the defendant misappropriated the plaintiff's "labors, skills, expenditures, or good will and displayed some element of bad faith in doing so").  Because the law of unfair competition "stresses the element of unfairness rather than the element of competition," Louis Capital Markets, L.P. v. REFCO Group Ltd., LLC, 801 N.Y.S.2d 490, 494 (Sup. Ct. New York Co. 2005), an unfair competition claim necessarily involves some degree of bad faith on the part of the defendant, see Berman v. Sugo LLC, 580 F. Supp. 2d 191, 209 (S.D.N.Y. 2008).

In its combined opposition and reply papers, Metito essentially drops any independent claim of unfair competition, and rests this cause of action solely on the alleged misappropriation of trade secrets through Sonmale (P O'ppn 20-22), which, as discussed above, are without merit.

24

Accordingly, this claim must also be dismissed.

In any event, the record contains no evidence of unfair competition.  The essence of Metito's original allegation was that GE actively solicits the employees of competitors, or at least has no policy prohibiting such action.  (P Mem. 7, citing Nasr Tr. 73:11-13.)   Metito readily concedes, however, that there is no indication that GE has any affirmatively policy of hiring employees in breach of a non-competition clause.  (Hr'g Tr. 7:21-8:19.)  And, policy or no, the objective fact of the matter is that full discovery in this matter has uncovered only three former Metito employees now employed by GE, and only a single instance in which GE hired a Metito employee with a non-compete agreement.

Metito invokes the specter of various employees who it claims were the subject of GE's "predatory" practices.  (P. Mem. 8-9.)  The evidence in support of this theory consists of several internal GE emails identifying potential candidates for employment, none of whom had non-compete agreements, and none of whom were even hired; emails from non-GE employees suggesting Metito employees for potential employment, to which GE did not respond; and conversations concerning potential employment between GE and four Metito employees who did not have non-compete agreements and one who did, as to whom there is no evidence that GE knew of such agreement.

There is nothing remotely unfair about these practices.  Even assuming that GE did engage in solicitation, inducement of an at-will employee to join a competitor is not actionable, "unless dishonest means are employed, or the solicitation is part of a scheme designed solely to produce damage."  Headquarters Buick-Nissan, Inc v. Michael Oldsmobile, 539 N.Y.S.2d 355, 357 (1st Dep't 1989).  Metito does not suggest that either of these exceptions applies here.  In

any event, any attempted solicitation of these people was, by all accounts, unsuccessful, and thus precludes Metito from being able to demonstrate the "essence" of this claim – that GE has, in fact, misappropriated any of its labors or expenditures.[10]   Accordingly, GE is entitled to summary judgment on Metito's unfair competition claim.

## VI.    Defamation

Finally, GE is entitled to summary judgement on Metito's claim of defamation arising from its allegation that Karim Nasr, a GE employee, attacked Metito's "integrity and credit" during a conversation with Metito employee Walid Oraby at an industry trade show in Dubai in April 2005.  In contrast to every other claim discussed, the parties do not agree – either explicitly or implicitly – what law should be applied to this claim.  Metito argues that New York law applies because defendant General Electric Company is incorporated in New York, giving New York "the greatest and most overriding interest" through its interest "in controlling its corporate progeny," and that Nasr's words constitute slander per se under New York law.  (P Opp'n 22-23, 25.)  GE, by contrast, asserts that the law of the UAE, the situs of the tort, applies.  (D Mem. 22 n.8; D Opp'n 8-9.)

A district court sitting in diversity applies the choice of law rules of the forum state in which it sits, in this case, New York.  Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 491 (1941); Lee v. Bankers Trust Co., 166 F.3d 540, 545 (2d Cir. 1999).  Under New York choice of law rules, the first step is to determine whether there is any actual conflict of law.  Curley v.

---

[10]  Oraby's allegations that during his conversation with GE "it became clear that I would be expected to make available to GE all I knew about Metito so that GE would have a better chance of getting projects in the water purification/desalination industry" (Oraby Decl. ¶ 3) could suggest attempted "wrongful means," but there is no suggestion that Oraby ever disclosed any confidential information.

AMR Corp., 153 F.3d 5, 12 (2d Cir. 1998).

Here, there is a clear conflict between the defamation laws of New York and the UAE. In New York, defamation may exist without any injury where the defamation concerns a category of "slander per se." See Albert v. Loksen, 239 F.3d 256, 266 (2d Cir. 2001) (discussing New York law). The UAE, by contrast, always requires proof of injury.[11] "There is no specific tort of defamation under UAE law," and, as a result, the "general provisions on torts contained in the chapter of the UAE Civil Code dealing with wrongful acts" applies to all such claims. (Laubach Supp. Decl. ¶ 4.) The elements that plaintiff must prove are "the breach of duty owed to another, the occurrence of harm to the other party, and a causal relationship between the wrongful act and the harm." (Laubach Supp. Decl. ¶ 4; accord, Laubach Decl. ¶ 33.)

Where such a conflict exists between contending tort laws, New York engages in an "interests analysis," applying the "law of the jurisdiction with the most significant interest in, or relationship to, the dispute." White Plains Coat & Apron Co., 460 F.3d at 284. For conduct regulating torts – such as defamation – the jurisdiction with the greatest interest is generally the jurisdiction in which the tort occurred. See id.; Lee, 166 F.3d at 545 (applying the law of the jurisdiction where the alleged defamation occurred over the law of the jurisdiction in which defendant was headquartered). Because the alleged defamation occurred in the UAE, UAE law

---

[11] Pursuant to Rule 44.1 of the Federal Rules of Civil Procedure, the Court has considered the declarations of Charles S. Laubach – a partner in a UAE legal consulting firm based in Dubai (Laubach Decl. ¶ 2) – in determining UAE defamation law. See Fed. R. Civ. P. 44.1 ("In determining foreign law, the court may consider any relevant source material, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence."); see also Euromepa, S.A. v. R. Esmerian, Inc., 154 F.3d 24, 28 n.2 (2d Cir. 1998) (affidavits submitted by the parties a proper source for determination of foreign law). GE submitted the Laubach declarations in connection with its motion for summary judgment. Metito did not offer any analysis of UAE law.

applies to this claim, and to succeed Metito must prove that GE's breach of a duty to Metito caused harm to Metito.

Putting aside whether any of Nasr's comments could reasonably be construed as defamatory so as to constitute a breach of a duty, Metito's defamation claim fails because there is no evidence of any injury, as required under UAE law.  (Laubach Decl. ¶ 4.)  The alleged defamatory remarks arose in a conversation exclusively between one Metito employee and two GE employees.  (D 56.1 Stmt. ¶ 148; P Resp. Stmt. ¶ 148.)  Although the Metito employee may have considered the comments to be an attack on Metito, Metito did not suffer any harm as a result of Oraby's exposure to these such attacks because Oraby outright rejected them as false.  (Oraby Tr. 20:23-21:10; 21:25-22:2; D 56.1 Stmt. ¶ 150; P Resp. Stmt. ¶ 150.)  Metito does not argue otherwise, nor does Metito offer any other indication of harm suffered.  Accordingly, GE is entitled to summary judgment.

## VII.    The General Electric Company

Metito's claims are fundamentally defective in yet another way, that independently requires their dismissal.  Although this Opinion has, by and large, referred to "GE" in a general manner as encompassing the defendant General Electric Company and congeries of its subsidiaries, the only entity named as a defendant in this case is the parent General Electric Company itself.  Metito insists that it has sued the proper defendant and seeks to hold the General Electric Company liable for all the actions of its subsidiaries.  Although the Court has concluded that Metito's claims are unsustainable against any and all GE entities, none of those claims, if they were viable on the merits, could be pressed against the named defendant.

Metito does not seek to hold the General Electric Company liable on the basis of veil piercing.  (Hr'g Tr. 7:2-8.)  Rather, Metito contends that the General Electric Company "makes the decisions and develops the policies, which are then executed by GE Infrastructure and its subsidiaries."  (P O'ppn 7.)  Metito's decision to sue only the General Electric Company, and the attendant need to rely on overarching policy arguments, appears to have been a deliberate tactical choice made in an effort to obtain jurisdiction in New York and tie together various minor and unrelated episodes in the Middle East into an allegedly pervasive overall conspiracy. However, the closest Metito is able to come to offering evidence of any such policy are vague references to the motto "One GE" (e.g., P Resp. Stmt. ¶ 37), testimony by GEII employee Nasr to the effect that GE has no policy that prohibits active recruiting of competitor's employees (Hr'g Tr. 7:21-8:7), and the fact that GE Europe's Verdonck was involved in hiring employees for multiple subsidiaries (Hr'g Tr. 9:16-10:8).  None of this is sufficient to show any overriding policy emanating from the General Electric Company.  Metito does not point to any individual employed by or associated directly with the General Electric Company who is alleged to have been involved in any of the alleged actions that form the basis for its claims, and in fact concedes that it has no evidence of the General Electric Company's involvement in the incident that constitutes the centerpiece of this case – the hiring of Sonmale.  (Hr'g Tr. 10:13-24.)[12]  As a result, even if there were evidence to sustain any of Metito's claims, the defendant in this litigation would not be the proper party to be held accountable for any resulting liability.

---

[12]  Although Metitio failed to rely on this fact at oral argument, there is evidence suggesting that Freal-Saison, who interviewed Sonmale, is employed by an unincorporated subdivision of the General Electric Company.

## CONCLUSION

For the foregoing reasons, Metito's motion for partial summary judgment (Doc. #45) is

denied and GE's motion for summary judgment (Doc. #50) is granted.

SO ORDERED.

Dated: New York, New York
       February 17, 2009

GERARD E. LYNCH
United States District Judge

30